In the Matter of the PATERNITY
OF T.M.,

B.M., Appellant–Respondent,

v.

S.K., Appellee–Petitioner.

No. 49A02–1012–JP–1357.

Court of Appeals of Indiana.

July 19, 2011.

---

William D. Hall, Greenwood, IN, Attorney for Appellant.

## OPINION

BRADFORD, Judge.

Appellant–Respondent B.M. ("Father") appeals following the trial court's denial of his motion to set aside paternity affidavit and for DNA testing regarding the paternity of his child, T.M. We affirm.

## FACTS AND PROCEDURAL HISTORY

T.M. was born on June 1, 1995, in Indianapolis to unmarried parents. On June 2, 1995, Father executed a paternity affidavit claiming to be T.M.'s natural father. According to Father, T.M.'s mother, S.K. ("Mother"), had told him that he was the only possible father to T.M. Father was advised of his right to a DNA test but declined.

On September 9, 1997, Father and Mother filed a joint petition to establish support and related matters. On September 11, 1997, pursuant to the parties' agreement, the trial court entered an order establishing their parental status. In addition, the trial court awarded custody of T.M. to Mother, awarded Father visitation, and it ordered Father to pay T.M.'s medical insurance and $67 per week in child support. Thereafter, certain provisions of the order were modified, including on June 22, 1998. At no time did Father request genetic testing or challenge his paternity to T.M.

For the first fourteen years of T.M.'s life, Father held himself out to be T.M.'s father, paid child support, provided health insurance at times, and exercised primary physical custody and parenting time for substantial periods of time.

In February 2009, when T.M. was finishing his eighth-grade year, T.M. began living with Father and Father's wife, V.D. According to V.D., T.M. did not share traits with Father, so V.D. purchased a DNA kit in September 2009. The kit, purchased from Walgreens, required that Father and T.M. take mouth swabs and mail them to Identigene in Salt Lake City, Utah, for testing. According to Father, he and T.M. submitted the required swabs to Identigene. Mother did not give her permission for T.M. to participate in this test. On December 1, 2009, Identigene issued its results by email informing Father that he was not T.M.'s biological father.

On February 12, 2010, Father moved to set aside his paternity affidavit and for DNA paternity testing. Father alleged in his motion that his execution of the paternity affidavit was a result of fraud and material mistake of fact. The trial court held a hearing on August 31, 2010, during which it also conducted an in-camera interview of T.M. At the hearing, the trial court did not admit the DNA results into evidence following Mother's objection on the grounds that they were not properly certified. Also at the hearing, Mother testified that she and Father were involved in a sexual relationship at the time of T.M.'s conception, that she was not "seeing" anybody else at the time, and that there was no reason for Father not to believe her

when she told him he was T.M.'s father. Tr. p. 89.

On October 27, 2010, the trial court denied Father's petition, finding no fraud, duress, or mistake of fact. In denying the petition, the trial court observed that the information relied upon by Father in petitioning to rescind his paternity affidavit resulted from a "mail-in" paternity test, the results of which were not obtained through the course of ordinary medical care or inadvertent discovery. The trial court further observed Mother's testimony regarding her exclusive relationship with Father and found that Mother believed Father was the biological father of T.M.

Father subsequently filed a motion to correct errors, which the trial court denied on December 9, 2010. This appeal follows.

## DISCUSSION AND DECISION

Initially we note that Mother did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing arguments for her, and we apply a less stringent standard of review with respect to showings of reversible error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind.Ct.App.2006). That is, we may reverse if the appellant establishes *prima facie* error, which is an error at first sight, on first appearance, or on the face of it. *Id.*

▌ Father challenges the trial court's denial of his petition to set aside his paternity affidavit and for DNA testing. There is no dispute that Father executed a paternity affidavit in 1995 claiming to be T.M.'s biological father. Once a man has executed a paternity affidavit in accordance with Indiana Code section 16–37–2–2.1, he is the child's legal father unless the affidavit is rescinded pursuant to the same statute. *See* Ind.Code § 31–14–7–3 (2009); *see also J.M. v. M.A.*, 950 N.E.2d 1191 (Ind.2011) (discussing rescission of paternity affidavits). Father filed his petition to rescind his paternity affidavit approximately fourteen years after he executed it. Indiana Code section 16–37–2–2.1(i) (2009)[1] provides as follows for rescission of paternity affidavits more than sixty days after they are executed:

A paternity affidavit that is properly executed under this section may not be rescinded more than sixty (60) days after the paternity affidavit is executed unless a court:

(1) has determined that fraud, duress, or material mistake of fact existed in the execution of the paternity affidavit; and

(2) at the request of a man described in subsection (h),[2] has ordered a genetic test, and the test indicates that the man is excluded as the father of the child.

These provisions reflect the legislature's intent to provide assistance to a man who signed a paternity affidavit due to fraud, duress, or material mistake of fact. *In re Paternity of M.M.*, 889 N.E.2d 846, 847 (Ind.Ct.App.2008).

Public policy favors establishing the paternity of a child born out of wedlock. *See M.M.*, 889 N.E.2d at 848 (citing Ind.Code

---

1. Indiana Code section 16–37–2–2.1 has since been amended by P.L. 25–2010, Sec. 1. Father filed his petition in February 2010, prior to the effective date of the amendments, so we will refer to the prior version of the statute.

2. Indiana Code subsection 16–37–2–2.1(h) (2009) states as follows: "Notwithstanding any other law, a man who is a party to a paternity affidavit executed under this section may, within sixty (60) days of the date that a paternity affidavit is executed under this section, file an action in a court with jurisdiction over paternity to request an order for a genetic test."

§ 31–14–1–1). Public policy also favors correctly identifying parents and their offspring. *See id.* (citing *In re S.R.I.,* 602 N.E.2d at 1014, 1016 (Ind.1992)). Indeed, public policy disfavors a support order against a man who is not the child's father. *See id.* (citing *Fairrow v. Fairrow,* 559 N.E.2d 597, 600 (Ind.1990)).

■ Nevertheless, a man who executed a paternity affidavit may not fail to timely request genetic testing under Indiana Code section 16–37–2–2.1 and then, as a matter of course, request such testing as a fishing expedition. *Id.* Legal fathers may not " 'disestablish paternity outside of the sixty-day time limitation, absent a claim of fraud, duress or material mistake of fact.' " *Id.* (quoting *In re Paternity of E.M.L.G.,* 863 N.E.2d 867, 870 (Ind.Ct.App.2007)). A legal father may challenge paternity only " 'in extreme and rare instances' " and the challenge must be made by " 'evidence that has become available independently of court action.' " *Id.* (quoting *E.M.L.G.,* 863 N.E.2d at 870).

■ Here, Father's challenge is largely premised upon his assumption that the DNA results from Identigene were admissible and reliable. But the trial court concluded that they were not. The admissibility of evidence is a matter within the trial court's discretion, and will be reversed only upon a showing of abuse of discretion. *Herrera v. State,* 710 N.E.2d 931, 938 (Ind.Ct.App.1999). The single DNA test came from a mail-in kit, the test specifically stated that it was not to be used for legal purposes, and there was no information from the purported laboratory where the tests were conducted, or the persons conducting those tests, establishing a foundation to support the reliability of their results. While Father cites multiple facts in his brief in support of the admissibility and reliability of such tests, he points to no place in the record where these facts were introduced before the trial court. We find no abuse of discretion in the trial court's refusal to admit the test results.

In the absence of admissible test results to the contrary, the trial court specifically credited Mother's belief that T.M. was Father's biological child and that she and Father were in an exclusive relationship at the time of T.M.'s conception. The trial court was within its fact-finding discretion to make this credibility assessment, and we will not reweigh that evidence.

Father compares his case to *M.M.,* wherein this court reversed and remanded for genetic testing when two genetic tests showed that a father, who had executed a paternity affidavit for a child, shared no genetic link to the child. 889 N.E.2d at 849. While the nature of the tests in *M.M.* is unclear, the genetic testing was purportedly with the consent of both parents, there were two tests, their results were part of the record, the mother offered no testimony, and the trial court denied the father relief on the apparent grounds that disestablishment of paternity contravenes public policy. *Id.* at 847, 849. Importantly, the admissibility and/or reliability of the tests in *M.M.* did not appear to be at issue. Here, in contrast, only one test was conducted, it was conducted without the consent of both parents, its results were not admitted, Mother's testimony specifically did not support a finding of fraud or mistake of fact, and the trial court's judgment was based upon its inclination to credit Mother's testimony. We are unpersuaded that the result in *M.M.* is applicable to the case at hand.

The judgment of the trial court is affirmed.

BAKER, J., and MAY, J., concur.